Filed 12/19/25  P. v. Slaieh CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NABEEL NAIEM SLAIEH,<br><br>    Defendant and Appellant. | D086914<br><br><br>(Super. Ct. No. SWF2007254) |

APPEAL from a judgment of the Superior Court of Riverside County, Christopher B. Harmon, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal; Law Office of Zulu Ali & Associates and Zulu Ali, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Monique Myers, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Nabeel Naiem Slaieh appeals the judgment imposed following his jury trial conviction of criminal threats (Pen. Code, § 422), stalking (Pen. Code, § 646.9), unlawfully using an electronic tracking device

to determine location or movement of a person (Pen. Code, § 637.7), annoying or harassing telephone calls or electronic communication (Pen. Code, § 653m), and violation of a protective order (Pen. Code, § 136.2).

Slaieh raises five issues on appeal.  First, he contends his prior uncharged acts of domestic violence were inadmissible under Evidence Code[1] section 1109 because stalking is not a domestic violence crime or, in the alternative, it was more prejudicial than probative and should have been excluded under section 352.  Second, he challenges the sufficiency of the evidence of his convictions, alleging they were based on circumstantial evidence and speculation alone.  Third, he argues the trial court abused its discretion by finding that he did not meet the threshold requirements to trigger a review of the officer's personnel file under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).  Fourth, he contends his speedy trial rights were violated when the court continued the trial at defense counsel's request over his objection.  Finally, he alleges the trial court violated his Eighth Amendment right against cruel and unusual punishment and abused its discretion by sentencing him to 16 months in state prison.

Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Prosecution Evidence*

J.F. testified that she began dating Slaieh in early 2008 and gave birth to their son, A.S., in August 2010.  Slaieh and J.F. married in February 2014 and lived together from 2014 to 2017.  In 2017, she moved out and filed for divorce and a restraining order.

---

[1]     Unless specified, further statutory references are to the Evidence Code.

After their son was born, Slaieh became more jealous and controlling over J.F. and her two other children from a prior marriage. He was jealous of any outside relationship of J.F. and was controlling over the children's behaviors.

In February 2017, J.F. committed what Slaieh considered a "betrayal" when she "disobeyed him by going to [her] friend's daughter's birthday party." "He told [her] to get the hell out of the house." So she went to the garage, but upon realizing their son was in the house, she went back inside to the nearby bathroom and hoped he would settle down. Instead, he followed her into the bathroom and slapped her across the face.

Around July 2017, Slaieh went to J.F.'s new home and pulled her outside of the doorway. J.F. filed for temporary restraining orders in February, May, and July 2017, however they were dismissed because she failed to appear at the hearings.

J.F. also filed for divorce in May 2017. While they were going through the divorce, they met regularly to try to keep things civil for the benefit of their son and discuss the status of their relationship. However, Slaieh would get angry at her because he did not want to get divorced.

In August 2018, J.F. called the police because Slaieh said things that scared her. He said, "If I can't have you, no one can"; "Nobody is going to have you if I can't have you. Nobody will have you"; and "Not now, not today, but you will get it." Although she called the police, she asked that they not contact Slaieh because she was fearful it would "provoke" him and make things worse.

Slaieh occasionally demanded J.F. call him and, if she did not, or was unable to placate him, it would "escalate to another level" and he would say

3

something like, "If you don't answer, I will drop by, and I will do something else." He repeatedly visited J.F.'s new home uninvited and unannounced.

On February 4, 2020, J.F. took their six-year-old son, A.S., to his hockey game. Slaieh uncharacteristically arrived at the end of the game and then said he wanted to take A.S. for the night. With the unexpected night free, J.F. called C.C., someone she had met a few months earlier, and C.C. invited her to his house.

After the game, J.F. drove home, changed her clothing, and went to C.C.'s home. About an hour after she had arrived at C.C.'s home, Slaieh pounded on the front door. C.C. opened the door, and Slaieh was standing there, "screaming at the top of his lungs," "I am going to ******* kill you" and "I caught you." C.C. shut the door and called 911.

J.F. later discovered she had numerous missed calls and voice messages from Slaieh. Slaieh texted, "Who are you with? Where are you?," and "Whose place are you at?" He accused her of dating another man and called her a "traitor." After she asked him to stop, Slaieh told her, "I will do what I have to do." J.F. felt harassed and scared because Slaieh would say "not today, not tomorrow, but you will get it" or "not now but later."

Slaieh continued to call J.F. every 10 minutes, all night long, and text her in between. He did not stop after she asked him to stop, but instead responded, "I will stop when I am ready to stop and when I make you pay."

J.F. found Slaieh's text messages offensive and "horrifying," including, "I will make you sick for the rest of your life," "Your hopefully short life. I hate you, bitch." He texted, "This time it's criminal. Cheating on me will never be forgiven." Once again, when J.F. asked him to stop, he said he was "not going to stop" and that he would stop "when [she] is gone."

4

J.F. perceived Slaieh's text messages as threats, including, "You will pay for this. What comes around goes around, and I told you that a few days ago. Go away." He texted her, "Nothing will satisfy me until you disappear from my life forever. You have robbed me from my happiness so you can go away and get ****** by a stray dog." "I wish you'd go away from our lives, never to be seen again. That's how much I hate you now." "You must pay for this. I will let everybody look at you as I do."

J.F. believed Slaieh's text messages indicated he could kill her: "The only thing that will relieve me is when you go away forever. Go away. I hate you." Despite not being in a romantic relationship, he texted her: "No wonder you could not turn me on anymore in my thoughts for the past six months. My sense was telling me you were cheating without consciously knowing it. Go away. I hate you."

J.F. could not figure out how Slaieh knew she was at C.C.'s house because Slaieh did not know C.C. and J.F. had never been to C.C.'s home before that night. She installed a GPS tracker detection application on her cell phone, and it alerted that she had a GPS tracking device in her car. She took the car to a mechanic to locate the device, and the mechanic found a GPS tracker in the interior compartment of her car's truck. Law enforcement executed various search warrants, which revealed Slaieh's phone number and name were associated with the GPS tracker, and that the device was activated on February 4, 2020, and deactivated about a week later.

J.F. was afraid when Slaieh was at C.C.'s door and that fear increased when she read his text messages and listened to his voice messages. That fear was further heightened when she learned he had put a GPS tracking device in her car. She was "horrified" and "beyond frightened."

A criminal case against Slaieh with an attendant criminal protective order naming J.F. as the protected party was filed in March 2020. As part of the protective order, Slaieh was to have no contact with her except through an attorney of record. During this period, she and her children lived in fear of what Slaieh would do. They "didn't open [the] blinds for two years, three years because he would just show up . . . [and] wouldn't leave."

In May 2020, a second GPS tracking device was discovered in J.F.'s car. The second GPS device was the same brand but a smaller model than the first GPS device. However, despite executing search warrants, law enforcement was not able to ascertain the subscriber information for the second device.

## II.

### *Defense Evidence*

Slaieh testified that, although he and J.F. were legally divorced by November 2020, they continued to participate in normal family activities like traveling and going to the beach from 2017 to 2020. Also, during that time, J.F. said she loved him, and they had a sexual relationship.

On February 4, 2020, the day of A.S.'s hockey game, Slaieh told J.F. that he would attend the game and keep A.S. for the night. He arrived when 10 minutes remained in the game. He took A.S. home and his son from another relationship watched A.S. while Slaieh went to J.F.'s house. She had said she was going to pick up her daughter, but he followed her, and he saw that she went to someone else's house. He called J.F. and she said she was upstairs. He knew "something's not right, something's not proper."

Slaieh peeked into the window of the house and saw J.F. playing pool with a man. When she kissed the man, it was devasting. Slaieh knocked on

6

the door and said, "That's my wife." He denied using profanity or threatening to kill her.

Thereafter, Slaieh called and texted J.F. because his feelings were hurt. He never threatened her. He explained that messages like "you will pay for this" were not intended to hurt her, they were sent because "[w]hen someone does something wrong, eventually lie to God—it depends on your faith—He will punish you for this. You do good, you get good. When you do bad, you will face bad in your life." When he texted J.F. that he would not stop until she was gone or erased, it meant until she was out of his life.

Slaieh denied placing a GPS tracker in J.F.'s car and denied that the phone number tied to the GPS device was his. He denied having previously said to J.F., "Not today, not tomorrow, but later on, I'm gonna take an action that you really don't like."

As to the February 2017 incident, Slaieh denied slapping J.F. across the face. He said she drinks alcohol every day and becomes a "hostile drinker." That day, he went to the bathroom, and she followed him into the bathroom while yelling at him. She blocked his ability to leave the bathroom and, after he grabbed her shoulders to move her so he could pass, she turned to A.S. and said Slaieh had hit her. He was not arrested for this incident.

Around July 2017, Slaieh arrived at J.F.'s new house to pick up A.S. and J.F. was intoxicated and screamed at him. She filed for a second restraining order, and it was ultimately dismissed.

Slaieh's son from a different relationship described Slaieh as a nice guy who never physically punished him and was not controlling. From 2017 to 2019, he would babysit A.S. so that Slaieh and J.F. could go on dates and, during that time, he saw them hug and kiss each other. In February 2020, Slaieh called him at the last minute to babysit A.S., and he agreed. Slaieh

7

came home looking sad and said that he caught J.F. cheating on him. He did not feel like either J.F. or his dad were lying to him.

DISCUSSION

I.

*The Trial Court Properly Admitted Evidence of Prior Domestic Violence*

Slaieh alleges that the prior acts of domestic violence were not admissible under section 1109 to prove his propensity to engage in stalking. In the alternative, he asserts the incidents should have been excluded under section 352. We disagree.

A. *Relevant legal principles*

Pursuant to section 1101, "Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) There are, however, important exceptions to this rule in cases involving domestic violence. (*Ibid.*) As relevant here, section 1109, subdivision (a)(1), provides, "Except as provided in subdivision (e) . . . , in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Section 1109 thus "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes." (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)

As noted, section 1109 provides evidence of other acts of domestic violence is admissible "if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a).) "By its incorporation of section 352, section 1109, subdivision (a)(1) makes evidence of past domestic violence

8

inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).)

Section 1109 recognizes a distinction based on the length of time between the current offense and the other acts of domestic violence. Section 1109, subdivision (e) provides, "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." "Thus, while evidence of past domestic violence is presumptively admissible under subdivision (a)(1), subdivision (e) establishes the opposite presumption with respect to acts more than 10 years past." (*Johnson, supra*, 185 Cal.App.4th at p. 537, fn. omitted.) Subdivision (e) does not prohibit evidence of such remote acts. Indeed, "[i]t clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*Johnson,* at p. 539.) The inquiry under subdivision (e) is similar to the inquiry under section 352, and "the 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more probative than prejudicial.' " (*Johnson,* at pp. 539–540.)

We review a challenge to a trial court's decision to admit evidence pursuant to section 1109 for an abuse of discretion. (*Johnson, supra*, 185 Cal.App.4th at p. 539.) Under the abuse of discretion standard, "The burden is on defendant to show the trial court's decision was irrational or arbitrary." (*People v. Medina* (2018) 24 Cal.App.5th 61, 65.)

B.     *Additional relevant facts*

During in limine motions, the parties discussed the admissibility of the incident where Slaieh slapped J.F. across the face and the incident where he pulled her out of the house.  The prosecutor argued that even though there was no violence in any of the alleged charges, this case "amounts to stalking" because, even though "they had been estranged for two-and-a-half years," Slaieh "was under the impression that the alleged victim was still in a relationship with him" and therefore he felt she needed to "conduct" herself "as appropriate."  Because the instant offense arose from Slaieh purportedly catching J.F. cheating on him, the prosecutor contended exclusion of the prior incidents "would effectually limit the jury inappropriately" in determining whether the stalking involved "a credible threat of harm."  As to section 352, the prosecutor argued that the incidents occurred in 2017 so they were not remote in time.

Defense counsel argued that because the slapping incident involved physical violence and there was no physical violence in this case, the uncharged and charged offenses were dissimilar and should be excluded as prejudicial under section 352.  Additionally, defense counsel contended the court should exclude both incidents under section 352 because they were uncorroborated and therefore unreliable.

The trial court found the two incidents were admissible under section 1109 and did not believe they would be unduly prejudicial under section 352.

C.     *Stalking is a crime of domestic violence*

The plain language of section 1109 supports that stalking is included within the definition of domestic violence.  It defines 'domestic violence' as

10

having the meaning set forth in Penal Code section 13700 and, "if the act occurred no more than five years before the charged offense," additionally has the meaning set forth in Family Code section 6211. (Evid. Code, § 1109, subd. (d)(3).) Family Code section 6211 defines domestic violence as "abuse" committed against someone with whom the perpetrator has had a dating relationship. The Law Revision Commission notes to Family Code section 6211 refer to Family Code Section 6203 for the definition of "abuse." Family Code section 6203, in turn, defines "abuse" to include "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320," and expressly provides that "[a]buse is not limited to the actual infliction of physical injury or assault." (Fam. Code, § 6203, subds. (a)(4) & (b).) Behavior that may be enjoined under Family Code section 6320 includes "stalking," as well as attacking, threatening, battering, harassing, telephoning, and disturbing the peace of the other party. (Fam. Code, § 6320, subd. (a).) "Section 1109 applies if the [uncharged] offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition." (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144 (*Ogle*).)

Defendant's reliance on *People v. Zavala* (2005) 130 Cal.App.4th 758 (*Zavala*) is misplaced, as more recent cases have declined to follow *Zavala* and have rejected the arguments Slaieh makes here. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 361 (*Mani*) [evidence of uncharged acts of domestic violence was properly admitted in burglary trial because "the plain and unambiguous language of section 1109, subdivision (d)(3), incorporates, in addition to Penal Code section 13700, the Family Code definition of abuse—including the behaviors listed in Family Code section 6203, subdivision (a)(4)—provided that the events occurred within five years of the

11

charged offense"]; *Ogle, supra*, 185 Cal.App.4th at pp. 1144, 1142 [citing Family Code sections 6203 and 6320 and rejecting the defendant's contention "that his prior conviction for stalking was inadmissible to prove his propensity to commit the charged crimes because it was not an act of domestic violence within the meaning of section 1109"].)

Because "stalking" is behavior that may be enjoined under Family Code section 6320, stalking constitutes "abuse" under Family Code section 6203; abuse perpetrated against a former cohabitant or a person with whom the defendant has had a dating relationship is "domestic violence" under Family Code section 6211; and domestic violence under Family Code section 6211 is domestic violence for purposes of section 1109. (See *Ogle, supra*, 185 Cal.App.4th at pp. 1143–1144.)

Considering these definitions, stalking falls under the definition of domestic violence in Family Code section 6211 and thus meets the requirements for section 1109. (*Mani, supra*, 74 Cal.App.5th at pp. 364–366; *Ogle, supra*, 185 Cal.App.4th at p. 1144.) As a result, section 1109 applies when an "offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition." (*Ogle,* at p. 1144.)

Accordingly, a plain reading of section 1109 confirms "the Family Code definitions of domestic violence and abuse apply here because [Slaieh's] prior conduct at issue occurred within five years of trial. (§ 1109, subd. (d)(3).)" (*Mani, supra*, 74 Cal.App.5th at p. 364.) As such, the prior incidents were admissible under section 1109.

D. *Admission of uncharged acts was within the trial court's discretion*

Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its

admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Here, the uncharged conduct was squarely within the parameters of section 1109 and the risk of undue prejudice was minimal, particularly given the evidence that Slaieh previously assaulted J.F. was material and probative, since it went directly to Slaieh's intent to threaten her and the reasonableness of her fear. Moreover, its probative value was not substantially outweighed by its potential prejudicial effect. (See *Mani, supra*, 74 Cal.App.5th at p. 372 [incidents that were "not significantly more inflammatory than the charged offenses" posed no substantial danger of undue prejudice]; accord *People v. Case* (2018) 5 Cal.5th 1, 31–32.) Nor are we persuaded by Slaieh's argument that "[t]he jury was likely to be swayed by these allegations, leading them to convict based on past behavior rather than the specific charges before the court." (See *People v. Wilson* (2023) 89 Cal.App.5th 1006, 1014 ["Jurors are credited with intelligence and common sense," and "[w]e 'presume they generally understand and follow the instructions.' "].)

Having concluded there was no error, we decline to address the Attorney General's argument that any error was harmless.

## II.

### *Substantial Evidence Supports Slaieh's Convictions*

Slaieh contends his convictions must be reversed as they were based on "circumstantial evidence [that] lacked the clarity and context necessary to rise above mere speculation" and "potentially biased or inconsistent testimony [which] does not amount to the substantial evidence required for a conviction." We disagree.

As an initial matter, Slaieh does not clearly delineate which convictions he is contesting. We therefore conclude he waived his claim as to the sufficiency of the evidence as he raised it in a cursory manner and otherwise undeveloped it. (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672, citing *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "].) Moreover, even if he had not waived it, we would conclude his convictions are supported by substantial evidence.

A.    *Standard of Review*

We will not reverse the judgment " ' "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " ' the jury's verdict." (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Substantial evidence is "evidence that is reasonable, credible, and of solid value . . . ." (*Ibid.*) The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.) "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial." (*People v. Holt* (1997) 15 Cal.4th 619, 669.) To determine whether substantial evidence supports Slaieh's convictions, we review the whole record to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Manibusan,* at p. 87.) We review the evidence in the light most favorable to the prosecution. (*Ibid.*)

B.    *Criminal threats*

To prove the crime of criminal threat, "the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a

14

crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*), quoting Pen. Code, § 422, subd. (a).) "Case law defines 'sustained fear' as 'a period of time that extends beyond what is momentary, fleeting, or transitory.'" (*People v. Brugman* (2021) 62 Cal.App.5th 608, 634.) "Indeed, '[w]hen one believes he [or she] is about to die, a minute is longer than "momentary, fleeting, or transitory."'" (*Ibid.*)

Contrary to Slaieh's general contentions, the jury was entitled to credit J.F.'s testimony. The jury resolved any factual questions regarding Slaieh's intention and J.F.'s credibility against Slaieh by convicting him of the criminal threats, necessarily rejecting his version of the events. Considering all the evidence, including J.F.'s testimony, a rational jury could find that Slaieh's threat to kill her carried an immediate prospect of violence, that he intended it as a threat, and that her fear was reasonable based on his prior violent behavior toward her such that the conviction should be affirmed. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 358 ["Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion

15

the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal."].)

C.     *Stalking*

To prove the crime of stalking, the prosecution must establish that: (1) the defendant willfully and maliciously harassed or willfully, maliciously and repeatedly followed another person; (2) the defendant made a credible threat; and (3) the credible threat was made with the intent to place the other person in reasonable fear for her safety or the safety of her immediate family.  (Pen. Code, § 646.9, subd. (a).)  While the offense requires that the defendant make a  "credible threat" as an essential element, the  "credible threat" in support of a stalking conviction may be verbal, written, or implied through a course of conduct.  (Pen. Code, § 646.9, subds. (a), (g); see *People v. Lopez* (2015) 240 Cal.App.4th 436, 449 ["The threat underlying a stalking conviction may be implied from a course of conduct."].)  The threat need not contain "overt suggestions of violent intent" to constitute a "credible threat." (*Id.* at pp. 451–453.)

"The result is the stalking statute prohibits a course of conduct directed at a specific person that *a reasonable person would consider as seriously alarming, seriously annoying, or seriously tormenting a reasonable person.*" (*People v. Ewing* (1999) 76 Cal.App.4th 199, 208.)  The victim's fear need not be contemporaneous with the defendant's threats and harassment but rather can come later and be based on the totality of the circumstances, including "what a victim knows about a defendant." (*Planchard, supra*, 109 Cal.App.5th at pp. 170–171.)

Slaieh's actions constitute a course of conduct that would lead a reasonable person to fear for their safety.  Slaieh installed a GPS tracking device, followed J.F. to C.C.'s house, pounded on the door, and screamed at

16

the top of his lungs, "I'm going to ******* kill you" and "I caught you." She testified she was afraid when he was at the door, her fear was heightened when she saw his text messages, and then she grew even more fearful when she learned of the GPS tracking device he put in her car. The jury could reasonably conclude that Slaieh's threat, coupled with his prior history of domestic violence, and his messages that he had been watching her and was jealous, was "credible."

D.     S*ending an annoying or harassing electronic communication*

To prove the crime of sending an annoying or harassing electronic communication, the prosecution had to establish that Slaieh, "with intent to annoy or harass," made "repeated telephone calls," "repeated contact by means of an electronic communications device," or "any combination of calls or contact." (Pen. Code, § 653m, subd. (b).) Such repeated contact is prohibited "whether or not conversation ensues" from making the calls or contact. (*Ibid.*)

Slaieh sent J.F. many obscene and threatening text messages and, despite her pleading for him to stop, he refused. He responded: "I will stop when I am ready to stop and when I make you pay" and that he "will stop when [she] is gone." The jury could reasonably infer that Slaieh continued to send messages to annoy her. (See, e.g., *People v. Johnson* (2015) 61 Cal.4th 734, 775–776 [holding the defendant's telephone calls were sufficient to violate section 653m where defendant stated, "he could blow up his wife's workplace and that he could 'have something done' to her boyfriend"].)

The jury was free to reject Slaieh's testimony at trial that he was merely expressing his hurt feelings. Moreover, the fact that he may have been motivated by hurt feelings does not excuse him from annoying or harassing J.F.

17

E. *Unauthorized tracking*

Unauthorized tracking required the prosecution to prove that Slaieh: (1) used an electronic tracking device to determine the location or movement of a person; (2) the person tracked was the registered owner of the vehicle; and (3) the person tracked did not consent to being tracked. (Pen. Code, § 637.7.) Here, the only contested issue was whether Slaieh used the device to track J.F.'s location, and the jury's answer in the affirmative is substantially supported by the record.

As to the first GPS tracking device recovered, there was undisputed testimony that a search warrant revealed Slaieh was the subscriber, that the device was activated the day J.F.'s car was unattended at the hockey game and that Slaieh would have had access to it. As such, the jury's finding of guilt was not arbitrary.

While law enforcement was unable to ascertain the subscriber information for the second GPS device, there was circumstantial evidence that the jury could use to reasonably infer that Slaieh used it. The officer testified that the two GPS devices were the same brand and nearly identical. Additionally, despite separating, Slaieh still had access to J.F.'s car because he retained a hard copy of the vehicle's key, which was capable of unlocking J.F.'s car even though she had reprogrammed the key fob in the interim. The jury could have rationally found Slaieh's denials lacked credibility.

F. *Protective order violation*

To prove Slaieh violated a protective order, the prosecution had to prove: (1) a court issued a written order that Slaieh had no contact with J.F. except for peaceful contact for safe exchange of children and court ordered visitation; (2) the court order was a protective order in a pending criminal proceeding involving domestic violence; (3) Slaieh knew of the court order;

(4) Slaieh had the ability to follow the court order; and (5) Slaieh willfully violated the court order. (Pen. Code, § 166, subd. (c)(1).)

A second criminal protective order was filed in October 2020. It permitted peaceful contact between Slaieh and J.F. as related to her son. The only issue in dispute with Slaieh was whether he willfully violated it. In June 2021, the day before J.F. was to testify at a preliminary hearing, she received a text message from Slaieh that said, "Not now. Later." She interpreted that as a threat because while married, "he said that to [her] many times to stop [her]—to make sure that [she] [did not] do something that he [did not] want [her] to do." The jury was free to infer that Slaieh threatened J.F. to prevent her from testifying against him and willfully violated the protective order.

## III.

### *Pitchess Motion*

Slaieh contends the trial court erred by denying his *Pitchess* motion. He maintains the trial court should have held an in camera hearing to review the "credibility and potential bias" of an investigator in this case. We disagree.

A.   *Additional background*

After seeing a newspaper article about the investigator, who was accused of sharing answers to a promotional examination and later denying it, defense counsel filed a *Pitchess* motion concerning that investigator's "reputation for honesty and his credibility" and "racial bias." Defense counsel argued the article was "the basis for the in camera review as it relates to [the investigator]." "[T]hese are allegations that go towards his credibility . . . he's alleged to have engaged in misconduct. . . . It's potential impeachment

19

evidence; therefore, I think that falls" under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

The court denied the motion, finding that Slaieh had not met his burden to show good cause to merit an in camera review of the investigator's personnel file. Slaieh did not present "any alternate version of the facts, let alone a plausible one," and that he did not "deny any specific facts that the officers are expected to testify to." He failed to explain "in what respect the information" he sought "would be relevant to his defense or what the evidentiary goal impeachment would be."

B.      *Relevant Legal Principles*

The Supreme Court's decision in *Pitchess* established that a criminal defendant may " 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge against him." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018–1019 (*Warrick*).) The Legislature later codified *Pitchess* in Penal Code sections 832.7 and 832.8, and sections 1043 through 1045. (*Warrick,* at p. 1019.) In short, the *Pitchess* statutory "scheme entitles a defendant to information that will 'facilitate the ascertainment of the facts' at trial [citation], that is, 'all information pertinent to the defense.' " (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 14.)

*Pitchess* discovery under the statutory scheme proceeds in a two-step process. Under the first step, the defendant must file a written motion describing the type of records or information sought, supported by an affidavit showing "good cause" for the discovery or disclosure, setting forth the materiality of the discovery or disclosure to the "subject matter involved in the pending litigation," and stating upon reasonable belief that the

20

government agency at issue has the records or information requested. (§ 1043, subds. (a) & (b); *People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).) Then, if the trial court finds good cause for the discovery, it conducts an in camera review of the pertinent documents to determine which, if any, are relevant. (§ 1045, subd. (b).) " 'Subject to statutory exceptions and limitations . . . the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation." ' " (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086.)

At the first stage, a defendant need satisfy only a "relatively low" threshold to establish good cause. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83.) Nevertheless, a defendant is not entitled to an in camera review of peace officer personnel records without " 'establish[ing] a plausible factual foundation' " for the allegation of officer misconduct. (*Warrick, supra*, 35 Cal.4th at p. 1025.) The defendant "must present . . . a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents." (*Ibid.*) Corroborating collateral evidence is not required, nor is a defendant required to "present a *credible or believable* factual account of, or a motive for, police misconduct." (*Id.* at p. 1026.) Instead, all that is required is a showing that the alleged scenario "might or could have occurred." (*Ibid.*) "[D]epending on the circumstances of the case," a sufficient factual allegation in a *Pitchess* motion "may consist of a denial of the facts asserted in the police report." (*Id.* at pp. 1024–1025.)

A trial court has wide discretion when ruling on a *Pitchess* motion. (*People v. Memro* (1995) 11 Cal.4th 786, 832.) However, a trial court's exercise of its discretion is not unlimited and must be governed by the

controlling legal principles. (See *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.)

C.     *Analysis*

Slaieh failed to establish the good cause necessary to support an in camera review of the investigator's personnel file. He failed to offer a plausible factual scenario as to how the investigator's credibility, or lack of credibility, would have supported his defense. For example, he did not provide a plausible alternative factual scenario that would account for his own text message admissions that he was at C.C.'s home. (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1020 ["A showing of 'good cause' requires defendant to demonstrate the relevance of the requested information by providing a 'specific factual scenario' which establishes a 'plausible factual foundation' for the allegations of officer misconduct committed in connection with defendant."].)

Given Slaieh's failure to identify its relationship to his defense, the trial court did not abuse its discretion by finding that Slaieh failed to establish good cause to support an in camera review of the investigator's personnel files.

## IV.

### *Speedy Trial Claim*

Slaieh contends his case must be dismissed because he was denied his right to a speedy trial. We disagree.

A.     *Procedural Background*

Slaieh was arraigned on the complaint on April 3, 2020. Since then, Slaieh has been represented by a private attorney, the public defender's office, and a different private attorney, which resulted in six defense motions to continue. At a readiness conference in February 2023, both parties said

22

they were ready for trial and trial was set for April 2023. However, in April 2023, Slaieh filed another request for a continuance, which the court granted and reset the trial for June 2023.

Defense counsel then filed three more motions to continue the trial date, all of which were granted, and the trial date was ultimately set for September 2023. In September 2023, defense counsel requested the case be continued because he had just received GPS records and wanted additional time to consult with an expert. During defense counsel's request, the court acknowledged that Slaieh was shaking his head "no." Defense counsel explained that he and Slaieh disagreed on the need for a continuance.

The trial court inquired with Slaieh directly about the requested continuance. The court explained that Slaieh had both a right to a speedy trial and a right to competent and effective counsel of his choice. The court said the defense counsel's request for additional time to prepare "sounds legit." Slaieh said he did not want extra time and was willing to face whatever consequences came even if his attorney was not ready and regardless, the evidence should not be admitted.

The court explained, "The constitutional right to counsel . . . requires counsel to be effective and have adequate time to prepare. ¶ The information that's been provided is [defense counsel] has been recently provided with some information that's important to the defense that may assist—and may assist significantly—in defending [appellant] against his charges. ¶ The constitutional right to effective counsel always supersedes and trumps the right to speedy trial, at least statutory right to speedy trial."

Defense counsel added that he had not had adequate time to review the new materials, nor consult with an attorney but that this new information

would require him to "reevaluate" the defense strategy at trial, including drafting a new trial brief to incorporate the new strategy.

The court advised Slaieh that if he wanted to go to trial today, he could fire his attorney and represent himself. Slaieh did not want to fire his attorney. The court found good cause and the trial was continued to October 30, 2023. The court said that because the date was set over the defendant's objection, the court did not set that date as [Penal Code] section 1382 time and that will "be considered the last day for trial absent good cause being shown."

On October 30, 2023, both parties answered they are ready for trial. The court believed that Penal Code section 1382 had not attached before then because defense counsel had not answered ready at the last trial call, meaning the trial had to commence within 10 days. The prosecution agreed. Defense counsel disagreed and argued that he had anticipated answering ready at the last trial call but did not because the prosecution gave him more evidence. Moreover, because Slaieh objected to the continuance, the 10-day trailing period did not apply.

The court ruled the 10-day trailing period applied. The court recognized that Slaieh had a speedy trial right and a right to competent and effective counsel; however, it found that Slaieh "cannot have it both ways." "Competent and effective counsel needed additional time to pursue some additional information and advice that would aid in his defense." So, "[u]nless counsel says unequivocally, unconditionally, 'I'm ready to start trial today right now,' it is a continuance. When it's continued under these circumstances, the bulk of cases strongly demonstrate that the People—and the Court, for that matter—are entitled to a very minimal ten-day grace

24

period." The court then trailed the case to the following day due to a lack of available courtrooms.

On October 30, 2023, defense counsel filed a motion to dismiss for setting the trial date beyond the 60-day period specified by Penal Code section 1382, subdivision (a)(2). The motion was heard the following day. Defense counsel argued that the trial court's finding of good cause to continue the trial over Slaieh's objection was improper and in violation of Slaieh's speedy trial rights.

The court explained that Slaieh wanted counsel of his choosing, and that counsel needed more time to effectively represent him. It found Slaieh "cannot have his cake and eat it too." Defense counsel cannot say he needs more time to be competent while Slaieh simultaneously objects to extra time to cause Penal Code section 1382's trailing time to disappear. To do that would render Penal Code section 1382 meaningless and "reek" of "gamesmanship." As such, the trial court denied the motion to dismiss for a violation of his speedy trial rights and found the 10-day trailing period applied, making November 9, 2023, the last day to commence trial. The jury was sworn in on November 7, 2023, to try the case.

B.     *Relevant Legal Principles*

Under the United States and California Constitutions, the criminally accused are entitled to a speedy trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The speedy trial right is intended " ' " '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " ' " (*Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 937 (*Elias*).)

The California Legislature enacted Penal Code section 1382 to interpret and implement the constitutional speedy trial right. (*Elias*, *supra*,

25

78 Cal.App.5th at p. 937; *People v. Johnson* (1980) 26 Cal.3d 557, 561 (*Johnson*).)  The statute "provides that when a defendant charged with a felony is not brought to trial within 60 days of arraignment on an indictment or information (and the defendant has not expressly or impliedly consented to having trial set for a date beyond that period), the criminal charges against the defendant shall be dismissed unless there is 'good cause' for the delay." (*People v. Sutton* (2010) 48 Cal.4th 533, 537 (*Sutton*); see also Pen. Code, § 1382, subd. (a).)

Penal code section 1382 itself does not define "good cause."  (*Sutton, supra,* 48 Cal.4th at p. 546.)  But case law has established "that, in general, a number of factors are relevant to a determination of good cause:  (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay."  (*Ibid.*)  In evaluating good cause, "a trial court must consider all of the relevant circumstances of the particular case, 'applying principles of common sense to the totality of circumstances . . . .' " (*Ibid.*)

A trial court "has broad discretion to determine whether good cause exists to" continue a trial.  (*Sutton, supra*, 48 Cal.4th at p. 546.)  We review the trial court's good-cause determination for abuse of discretion.  (*Ibid.*) " 'Discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered.' " (*Elias, supra*, 78 Cal.App.5th at p. 938.)

C.    *Analysis*

Although Slaieh objected to defense counsel's request for a continuance, the continuance was necessary to ensure he received competent representation.  The trial court did not abuse its discretion when it found there was good cause to continue the trial date over Slaieh's objection because

the continuance was brief, and for his benefit, as it would allow competent defense counsel the opportunity to explore all viable defenses by consulting an expert. (*People v. Lomax* (2010) 49 Cal.4th 530, 556 [a trial court has discretion to determine what constitutes good cause to delay a criminal trial and "[i]f counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified"].) Therefore, defense counsel's request for a continuance was sufficient to constitute a waiver of Penal Code section 1382's 60-day time limit and trigger the 10-day grace period. (*Barsamyan v. Appellate Division* of Superior Court (2008) 44 Cal.4th 960, 969 ["Defense counsel, as part of his or her control of the procedural aspects of a trial, ordinarily has authority to waive the statutory speedy trial rights of his or her client, even over the client's objection, as long as counsel is acting competently in the client's best interest."].)

Indeed, had the trial court denied the motion to continue, by defense counsel's own representation, he would not have been prepared for trial. This would mean that Slaieh would have been denied his Sixth Amendment right to assistance of counsel. (See *Lomax, supra*, 49 Cal.4th at p. 556 ["[A] criminal defendant may not juggle his constitutional rights in an attempt to evade prosecution. He may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice."].)

Moreover, here, the trial court's finding that the 10-day grace period applied under Penal Code section 1382, subdivision (a)(2)(B), was also proper. Because defense counsel requested the continuance, the new trial date

beyond the initial 60-day period automatically came with the new 10-day grace period. (*Barsamyan, supra*, 44 Cal.4th at p. 970.) It was only after defense counsel announced that he and Slaieh were "actually and unconditionally free to commence trial proceedings" on October 30 that the 10-day grace period began to run. (*Id.* at p. 972.) Because defense counsel announced they were ready for trial on October 30, 2023, and the jury was sworn in on November 7, 2023, the trial began within 10 days of defense counsel's announcement that he was ready to proceed to trial and Slaieh's speedy trial right was not violated.

Finally, Slaieh offers no argument that he suffered any prejudice from the purported delay. Therefore, his claim necessarily fails. (*People v. Martinez* (2000) 22 Cal.4th 750, 769 ["[A] defendant asserting a statutory speedy trial claim must show that the delay caused prejudice, even though the defendant would not be required to show prejudice on pretrial appellate review"]; *People v. Lowe* (2007) 40 Cal.4th 937, 942 ["The defense has the initial burden of showing prejudice from a delay in bringing the defendant to trial."].)

## V.

### *Sentencing Claims*

Slaieh forfeited his sentencing claims on appeal because he did not object below to the trial court's alleged failure to give sufficient weight to his circumstances in mitigation nor suggest that the sentence was cruel and unusual punishment. (*People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"]; *People v. Baker* (2018) 20 Cal.App.5th 711, 720 ["A claim that a sentence is cruel or unusual requires a 'fact specific' inquiry and is forfeited if

not raised below."]; *People v. Norman* (2003) 109 Cal.App.4th 221, 229 [a cruel and unusual punishment claim is a fact-specific inquiry that "requires examination of the offense and the offender," such that it must be raised in the trial court].)

DISPOSITION

The judgment is affirmed.


HUFFMAN, J.*

WE CONCUR:


McCONNELL, P. J.


RUBIN, J.

_____

\* Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.